[Cite as *State v. Kamal*, 2019-Ohio-3928.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                                  Court of Appeals No.  L-18-1094

        Appellee                                      Trial Court No. CR0201603266

v.

Adel Ahmed Kamal                                      **DECISION AND JUDGMENT**

        Appellant                                      Decided:  September 27, 2019

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Lauren Carpenter, Assistant Prosecuting Attorney, for appellee.

Lorin J. Zaner, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from a judgment of the Lucas County Court of Common

Pleas which, following a jury trial, found appellant guilty of attempted murder and

aggravated arson and sentenced him to a total of 20 years in prison. For the reasons set forth below, this court affirms, in part, and reverses, in part, the judgment of the trial court.

{¶ 2} On December 12, 2016, a Lucas County Grand Jury indicted appellant Adel Ahmed Kamal on three counts of attempted murder of three victims (count 1 for Victoria Ladner, count 2 for Alan Scott Ladner, her husband, and count 3 for Jessica Cooper, her mother). Counts 1, 2 and 3 were each a violation of R.C. 2923.02 and 2903.02 and each a felony of the first degree. Appellant was also indicted on one count of aggravated arson (count 4), a violation of R.C. 2909.02(A)(3), (B)(1) and (B)(2), a felony of the first degree. Appellant hired Ivory Carter to burn a home at 5138 Golden Road in Toledo, Lucas County, Ohio, on November 3, 2016, knowing the home was occupied and the occupants would die as a result of the arson. Mr. Carter became a confidential informant for law enforcement prior to the arson incident. Subsequent to his arrest, appellant solicited another person, Juan Alvarez, to kill Mr. Carter prior to trial. Mr. Alvarez also became a confidential informant.

{¶ 3} A four-day jury trial commenced on March 5, 2018. The prosecution produced testimony, subject to cross-examination, from Mr. Carter and Mr. Alvarez, as well as from the three victims and law enforcement investigators. Appellant did not present any direct evidence at trial. The jury convicted appellant of all four counts, and the verdicts were journalized on March 12, 2018.

2.

{¶ 4} Then on March 22, 2018, the trial court sentenced appellant to a 10-year prison term for each count 1 through 4. Further, the trial court ordered count 1 to be served concurrently to counts 2 and 3. Pursuant to R.C. 2941.25(A) the trial court then found counts 2 and 4 were allied offenses of similar import and merged them for sentencing purposes. Appellee elected to sentence on count 2, and pursuant to R.C. 2929.11 and 2929.14(C)(4), the trial court ordered appellant to serve counts 2 and 3 consecutively, for a total of 20 years in prison. In addition to other sentencing orders, pursuant to R.C. 2967.28 and 2929.14, the trial court notified appellant that after his release from imprisonment, he will be subject to 5 years mandatory post-release control for each count 1 through 4. Further, the trial court notified appellant that having been convicted of an "arson-related offense" pursuant to R.C. 2909.13 and being an "arson offender" pursuant to R.C. 2909.14, he will be "required to comply with the requirements outlined in the Notice of Duties to Register given to the defendant in writing, in open court, until his death, unless the sentencing court determined otherwise with in-person verification annually."

{¶ 5} It is from the trial court's March 27, 2018 journalized sentencing judgment entry which appellant timely filed his appeal setting forth four assignments of error:

I. The convictions for Attempted Murder are against the manifest weight of the evidence.

II. The convictions (sic) for Arson are (sic) against the manifest weight of the evidence.

3.

III. The trial court erred in sentencing the Defendant as the offenses of Arson and Attempted Murder were determined to be allied offenses of similar import. As such, the conviction and sentencing on the Arson charges (sic) is in error.

IV. Appellant was denied his Constitutional right to effective assistance of counsel in this matter.

## I. Manifest Weight of the Evidence

{¶ 6} We will address the first two assignments of error together.

{¶ 7} A challenge to a jury determining guilt based on the manifest weight of the evidence questions whether the jury could find the inclination of a greater amount of credible evidence was admitted at trial to sustain that decision than not where the weight of credible evidence is not a question of mathematics; rather its effect in inducing belief. *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 75, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 8} It is well established that the trier of fact, whether in a civil or criminal matter, has the primary duty to decide what weight should be given to the testimony of any witness. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. We must "extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor." *State v. Beavogui*, 6th

4.

Dist. Wood No. WD-17-009, 2018-Ohio-2432, ¶ 55. Appellate courts must presume that the findings of the trier of fact are correct. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Judgments supported by some competent and credible evidence going to all the essential elements of the offense will not be against the manifest weight of the evidence. *Id.*

{¶ 9} This court has repeatedly stated that in determining whether a verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way to create such a manifest miscarriage of justice as to require a new trial. *State v. Reynolds*, 2017-Ohio-1478, 89 N.E.3d 235, ¶ 47 (6th Dist.). A conviction will be overturned only in exceptional cases. *Id.* Where the state's evidence is unrebutted, there are few, if any, conflicts for the trier of fact to resolve. *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 141.

**A. Aggravated Arson**

{¶ 10} In support of his second assignment of error, appellant argued Mr. Carter, the central witness claiming first-hand knowledge of the alleged criminal agreement, "had an extensive criminal record, [and] admitted to playing Kamal for months to his benefit." Appellant argued only Mr. Carter's testimony implied the inaudible portions of the audio evidence "will inculpate Kamal in these charges." Appellant concluded that "Carter should not be believed. The jury, in believing Carter and using that testimony to

5.

influence their interpretation of what is heard on the audio recordings created a decision that is against the manifest weight of the evidence and should be reversed."

{¶ 11} In response, appellee argued the jury did not lose its way. Appellee argued competent, credible evidence was introduced to the jury for it to determine appellant was guilty of aggravated arson.

{¶ 12} In order for appellant to be found guilty of aggravated arson appellee must prove beyond a reasonable doubt that on or about November 3, 2016, "No person, by means of fire or explosion, shall knowingly do any of the following: * * * Create, through the offer * * * of an agreement for hire or other consideration, a substantial risk of physical harm to any occupied structure." R.C. 2909.02(A)(3). "Whoever violates [R.C. 2909.02] is guilty of aggravated arson." R.C. 2909.02(B)(1). A violation of R.C. 2909.02(A)(3) is a felony of the first degree. R.C. 2909.02(B)(2).

{¶ 13} Appellee could meet its burden at trial using circumstantial evidence. *State v. Jenks*, 61 Ohio St.3d 259, 283, 574 N.E.2d 492 (1991).

> Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof. When the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction.

6.

*Id.* at paragraph one of the syllabus. Circumstantial evidence is testimony not based on personal knowledge or observation of the disputed facts, but of other facts showing indirectly the facts sought to be proved. *State v. Nicely*, 39 Ohio St.3d 147, 150, 529 N.E.2d 1236 (1988). "While inferences cannot be built on inferences, several conclusions can be drawn from the same set of facts; and a series of facts and circumstances can be used as a basis for ultimate findings." *State v. Lott*, 51 Ohio St.3d 160, 168, 555 N.E.2d 293 (1990). It is "well-settled under Ohio law that a defendant may be convicted solely on the basis of circumstantial evidence." *Nicely* at 151.

{¶ 14} We do not find appellant provided evidentiary support to indicate the jury's decision was an exceptional case to warrant reversal.

{¶ 15} Each of the three victims, Jessica Cooper, Alan Scott Ladner, and Victoria Ladner, testified at trial. Each admitted to having served prison time in the past. Their testimony established that Mr. and Mrs. Ladner lived at 5138 Golden Road, Toledo, Lucas County, Ohio, on November 3, 2016. Ms. Cooper testified she initially lived at the property with her daughter when the property was owned by appellant, but that she moved out well-before November 3, 2016, by which time the property was owned by her daughter. None of the victims notified appellant of the changes in occupancy at the property because appellant no longer owned the property.

{¶ 16} The record indicated appellant owned a large portfolio of investment properties and offered work to people related to the maintenance of those properties. For

7.

example, Ms. Cooper testified in the 17 years she knew appellant, she did intermittent cleaning jobs at his various properties.

{¶ 17} The record also indicated appellant allowed people to stay in his properties for free and, in some circumstances, he "gave" properties to them. For example, Mrs. Ladner testified she had known appellant for many years through her mother. When she was looking for a place to live, appellant "said that he had a house for me * * * because he knew that I had nothing. * * * He said he had a few houses for me to look at." One of the houses was at 5138 Golden Road.

Q: And did he say – well, whose house was it going to be?

A: Mine.

Q: All right. And did he ask anything in return for the house?

A: No.

{¶ 18} Mrs. Ladner further testified that after she thought appellant had fully transferred the property at 5138 Golden Road to her in February 2015, when her maiden name was Victoria Wise, she found out the transfer was "incomplete" because the deed was not filed with the Lucas County Recorder. Nonetheless, appellant insisted she owned the property because he had signed the deed to her.

{¶ 19} Mrs. Ladner testified she told appellant she was filing the deed with the Lucas County Recorder to "finalize" the transfer in her name. "He was telling me that it was already done. I didn't have to worry about it, that – that all the paperwork was complete." After she married, appellant's attitude changed towards her because appellant

8.

insisted the house was still his: "[A]ngry voice mails and stuff of that's still his house. * * * [B]ut he never said he was going to take me to court or, hey, I want it back or this was temporary. He never said that."

{¶ 20} Mr. Carter testified appellant told him why 5138 Golden Road was to burn down:

He was doing her a favor. He trusted her, and he put the house in her name. She got with some guy from prison. * * * [T]hey ended up taking, somehow taking the house, switching and marrying that guy, and ran off with the house. Kept the house. Didn't pay him nothing. That wasn't their agreement. So she just screwed him out of I think $92,000 or I think basically a $100,000 house. He trusted her and she took his house. That was the reason.

{¶ 21} The evidence in the record also indicated appellant owned vehicles and other tangible property which, in some circumstances, he gave for free or bought from people during a complex web of transactions or negotiations. For example, Mr. Carter testified knowing appellant for about 10 years before and after going to prison for his unrelated crimes. Mr. Carter had an informal work arrangement with appellant for intermittent cleaning jobs at his various properties, along with selling appellant stolen appliances needed at the various properties. Depending on what they negotiated, sometimes appellant paid Mr. Carter in cash and sometimes with other tangible items, such as a vehicle.

9.

**{¶ 22}** Mr. Carter testified appellant's criminal plan to burn down 5138 Golden Road was clear, but the payment arrangement took ongoing negotiations.

Q: Has the defendant ever attempted to hire you to commit a crime?

A: Yes.

Q: Specifically, has he ever asked you to burn a house for him?

A: Yes.

Q: And which house has he asked you to burn down?

A: It's on Golden.

* * *

Q: When you guys talked about burning this house down, did you ever discuss the people inside getting hurt?

A: Yeah.

Q: And what did he say about that?

A: He ain't care. He was very specific. He didn't care. They could die. All of them.

* * *

Q: Did he ever describe to you how to burn the house down?

A: Yes.

Q: All right. And what did he say regarding that?

A: The main thing was the stairs. He was showing me how to get in. When you go into the house, if you look out, you can't really tell from

the outside, but the door he showed me – I ain't got the picture – but that door, it goes up the stairs. And when you go up the stairs to get into the house, it should be a door to let you in, but you got to go straight up there. That's the way out. So when you go up the stairs, I was supposed to go in through this bottom door. You go up the stairs. I was supposed to put a whole bunch of gas so it can run down. Nobody get out that way. And I was supposed to put gas in the back with two five-gallon cans, one in the back of the house and one in the front, specifically. I was to go up the stairs right by the door and make sure it runs down the stairs.

* * *

Q: So, silly question, did you burn the house down?

A: No.

Q: Okay. Instead of burning the house down, what did you do?

A: I came to the law.

Q: All right. And instead of going to the law, why didn't you just tell him I'm not going to burn the house down?

A: Because I was still getting – I was getting stuff. As long as he thought I was going to take care of that, he was constantly trying to bribe me with stuff, so, of course I'm going to keep telling him I'm going to do it. I'm going to do it. He knew, because of my record, I'm capable and I would do it. So, of course, yeah, I'm going to do it. I'm going to do it.

I'm going to do it, yeah. Yeah. And he's constantly going to give me stuff. So you are going to do it, so, yes, my reason was because I was getting stuff from him and the big payoff was going to be once it was done, but it changed things once it wasn't just a house anymore.

Q: And what do you mean by that?

A: It went from this lady and d*** bought a house, to burn it up, to burn the people up inside the house with the house. That changed. That wasn't our agreement. That's what changed the whole, whoa.

{¶ 23} Mr. Carter testified after he contacted law enforcement to turn himself in and to report appellant's criminal plan, he was eventually vetted as a confidential informant. The record shows the vetting process involves the local Resident Agent in Charge conducting background checks, fingerprints, and sending a memorandum formally requesting approval to designate a person as a confidential informant to the Assistant Special Agent in Charge at the main office in Columbus, Ohio. Confidential informants can receive monetary compensation.

{¶ 24} Mr. Carter made an initial phone call on October 31, 2016, to appellant, which law enforcement recorded. Appellant correctly points out that the record includes some indication the quality of that recorded phone call is difficult to hear. The recording was admitted without objection at trial as evidence. However, appellant incorrectly indicates that only Mr. Carter testified as to what appellant said in the recording. Detective William Noon of the Toledo Police Department, Gang Task Force Unit,

12.

testified he investigated Mr. Carter's allegations regarding appellant's criminal plan: "Mr. Carter reiterated what (sic) the information he gave to me over the phone, so we decided to have Mr. Carter make a phone call to see if there was any legitimacy to his claim. So we had him make a phone call to Mr. Kamal and taped it. * * * Mr. Kamal wanted to burn a house down." Detective Noon was physically present when Mr. Carter called appellant on October 31, 2016.

Q: You recorded the call?

A: Yes, sir.

Q: Okay. And is there any particular reason why that call is more difficult to hear than the second call?

A: The recording device was put in the wrong port on the recorder.

Q: All right. Were you able to hear, generally, the conversation between defendant and Mr. Carter over the phone?

A: Yes, sir. * * * Mr. Carter and the defendant were talking about a house, about it being burned down. Mr. Kamal stated he didn't care about anybody being in the house * * *.

{¶ 25} Detective Noon further testified he also had Mr. Carter call appellant on November 3, 2016, to set up a meeting place for the money exchange for paying Mr. Carter for the arson job. Detective Noon was physically present when Mr. Carter called appellant on November 3, 2016, and confirmed appellant agreed to meet Mr. Carter for the money exchange later that day. The record does not indicate any witness had

13.

difficulty hearing this recording, which was also admitted without objection at trial as evidence.

{¶ 26} Detective Noon was also a Task Force Officer with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). Detective Noon testified that as a result of Mr. Carter's November 3, 2016, phone call with appellant, he coordinated ATF with Toledo police to have Mr. Carter wear a wire: "We had a recording device on Mr. Carter. * * * Along with a transmitter so that people could hear at the same time." The record does not indicate any witness had difficulty hearing this recording, and this recording was also admitted without objection at trial as evidence.

Q: And were you listening for something in particular before you were going to move in?

A: We were listening for an exchange of money. That would indicate he was paying Mr. Carter for the job of burning down the house on Golden Street.

Q: Okay. And did you hear that?

A: We did.

{¶ 27} Officers Keith Hurst and Melvin Haney, each of the Toledo Police Department, Gang Task Force Unit, testified he was part of the takedown team on November 3, 2016. They were in a nearby car listening to Mr. Carter and appellant talk about the exchange of money for the arson job. At the signal, they moved in to arrest appellant and transported him to the police station. Each officer testified he could clearly

14.

hear both Mr. Carter's and appellant's voices over the wire. Appellant talked during the ride to the police station, and each officer testified he could clearly match appellant's voice with the voice monitored over the wire.

{¶ 28} Mr. Carter testified at trial the precise payment appellant promised him for the crimes changed with their ongoing negotiations. He admitted to "spinning" appellant for as long as a year by promising appellant he would complete the crime in order to negotiate as many "things" from appellant as possible prior to the takedown.

Q: At the time he asked you to burn the house down, around that time, * * * did you guys ever talk about compensation for burning the house down, being paid one way or the other?

A: Of course.

Q: Okay. And what did he say he would give you for burning the house down?

A: [We] discussed different things. One time, it was supposed to be the one vehicle and the house, and then it was supposed to be this amount. And it was just very, you know what I'm saying, discussed on different things. Like, that's how I came up with the first car because I didn't have transportation. When are you going to do it. When are you going to do it. So I needed transportation. That's how I got the first car from him.

Q: Okay. When he said when are you going to do it, when are you going to do it, can you explain that a little bit more? Who was saying it to you?

A: Well, Adel asked me, like, he would give me things and he would ask me pertaining to this house. Are you still going to care of that. Are you still going to take care of that. And I was using Adel. As long as you tell him yeah, he would give me the money, tune the fuse. He would have me do other little, you know what I'm saying, for money. So that was the main one that he really wanted done, and he pressed the issue. And so as long as I stalled him out, I could still just get money and get stuff from him until it was my stall time was ran out pretty much, and then it was like now I'll do it or let me get somebody else to do it.

{¶ 29} Appellant argues in this assignment of error Mr. Carter's testimony was not credible, and the jury should not have believed a convicted criminal's testimony. The record shows appellant extensively cross-examined Mr. Carter in the presence of the jury, who had ample opportunity to observe the witness while he testified to determine credibility. In one of the many examples in the record, appellant directly attacked Mr. Carter's credibility:

Q: Okay. So then, let me just ask this. Since you never told [the detective] you are getting additional money for additional things, it is very

easy for someone with the gift of gab to make it seem as if you are getting money for burning down a house and a murder, right?

A: No, as far as that CI, as far as when you dealing business, you can't just go straight to the point of, hey, I'm trying to buy some drugs. Hey, I'm trying to burn. You have to play your hand. You have to make the person feel comfortable and talk about things that you normally talk about such as, hey, you want to buy this water tank and furnace. Then you ease this part in. That was the whole process. Not to just to blow my cover and come straight to him hard-core off just talking about straight to this crime. So, therefore, I would talk to him about other things, and then ease him back in to make him feel comfortable to freely get it on tape. So when you hear other things added as far as a refrigerator, that's normal for me and him[,] for me to steal him stuff like that. That was the whole purpose of I can't just go straight to the point. That what that was.

Q: And what you are talking about is having good skills as a snitch, as a confidential informant, right? Good skills, right?

A: If that's what you want to call it.

Q: Same kind of skills that you could use on me out on the street, that you could use on this jury, right?

A: The skills –

Q: Absolutely, right?

17.

A: No.

Q: Oh, it's not right?

A: No, it's not right.

Q: You can't make them think one thing and it's something completely different? You are saying that you can't do that?

A: I can't make them believe anything.

{¶ 30} Juan Alvarez testified at trial he is a convicted felon who was almost two weeks from being released when he met appellant in the Lucas County jail around November 3, 2016. Appellant solicited Mr. Alvarez to murder Mr. Carter because of this case and bragged about his crimes to everyone: "The whole block knew what he was doing, what he did."

Q: What did he ask you to do for him on his behalf regarding this case?

A: He said that there was somebody who wore a wire on him and that he needed him taken care of and that he would give me a house, a truck that he had, and a lot of work. * * * Landscape-wise.

Q: Okay. And when you say "taking care of," what do you mean?

A: Killing him.

{¶ 31} In addition to Mr. Alvarez's testimony, Detective Noon testified that he investigated Mr. Alvarez's allegations regarding appellant hiring him to murder Mr.

18.

Carter. As a result of that investigation, Mr. Alvarez was vetted to become a confidential informant for law enforcement.

{¶ 32} We reviewed the entire record and find a greater amount of credible direct and circumstantial evidence was admitted at trial for the jury to reach its decision of appellant's guilt for aggravated arson. Despite appellant's assertions to the contrary, we do not find the jury clearly lost its way to create such a manifest miscarriage of justice as to require a new trial.

{¶ 33} Appellant's second assignment of error is not well-taken.

### B. Attempted Murder

{¶ 34} In support of his first assignment of error, appellant argued Mr. Carter's interpretation of his conversations with appellant improperly influenced the jury as to the content of the inaudible audio tapes of those conversations. Appellant argued Mr. Carter and Mr. Alvarez each "had extensive criminal records, and both benefitted by their cooperation with law enforcement through monetary inducements." Appellant argued each of the three victims "provided no information that would inculpate [appellant]." Appellant further argued, "A reasonable person would infer that if [appellant's angry telephone message to one of the victims] was not reported to law enforcement, said alleged messages did not make [the victim] believe that [appellant] was a danger to her or to her family."

{¶ 35} In response, appellee argued the jury did not lose its way. Appellee argued "[c]ompetent, credible evidence indicates the defendant committed attempted murder."

19.

{¶ 36} In order for appellant to be found guilty of attempt to commit murder, appellee must prove beyond a reasonable doubt that, "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." R.C. 2923.02(A). "Whoever violates this section is guilty of an attempt to commit an offense. An attempt to commit * * * murder * * * is a felony of the first degree." R.C. 2923.02(E)(1). "It is no defense to a charge under this section that, in retrospect, commission of the offense that was the object of the attempt was either factually or legally impossible under the attendant circumstances, if that offense could have been committed had the attendant circumstances been as the actor believed them to be." R.C. 2923.02(B).

{¶ 37} The offense of murder is defined in R.C. 2903.02:

(A) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy.

(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of [R.C. 2903.03 or 2903.04].

(C) Division (B) of this section does not apply to an offense that becomes a felony of the first or second degree only if the offender previously has been convicted of that offense or another specified offense.

20.

(D)  Whoever violates this section is guilty of murder, and shall be punished as provided in [R.C. 2929.02].

{¶ 38} Attempted murder is a cognizable crime in Ohio.  *State ex rel. Tucker v. Matia*, 147 Ohio St.3d 418, 2016-Ohio-7450, 66 N.E.3d 730, ¶ 4.  The Ohio Supreme Court further explained "criminal attempt":

We have elaborated on the statutory definition as follows: "A 'criminal attempt' is when one purposely does or omits to do anything which is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." A "substantial step" requires conduct that is "strongly corroborative of the actor's criminal purpose. * * * This standard does properly direct attention to overt acts of the defendant which convincingly demonstrate a firm purpose to commit a crime, while allowing police intervention * * * in order to prevent the crime when the criminal intent becomes apparent." (Citations omitted.).

*State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 94-95.

{¶ 39} We do not find appellant provided evidentiary support to indicate the jury's decisions were an exceptional case to warrant reversal.

{¶ 40} Mr. Carter testified that on October 31 and November 3, 2016, appellant clearly told him the occupants at 5138 Golden Road would die as a result of the arson.

21.

Q: When you were on the phone [on October 31, 2016], how clear was he with you? We can't hear as well, but regarding the people, what would happen to the people in the house?

A: They were dying. It's more a recording where he made it clear they would die. He didn't care. He didn't care. He didn't care. I made it clear. Are you sure. This is murder. I was very, very clear over and over and over.

* * *

Q: My question was how clear was he regarding what would happen to these people in the house.

A: Very clear.

Q: Okay. And what was * * * clear about what would happen to them? What would happen to them?

A: The house would be burned up and they would die in the house.

* *

Q: And did you discuss this incident again [on November 3, 2016]?

A: Yes, we did.

Q: All right. And what did the defendant say to you again about this incident?

A: Everything was the same. Go, green light, go burn it up. He don't care.

* * *

Q: So he specifically said that, hey, there are going to be people in that house and I want you to burn it down, right?

A: He said that specifically and it's on the tape * * * that they can die. And that's on the tape and that was clear.

{¶ 41} Detective Noon testified that when he was present for Mr. Carter's October 31, 2016 telephone call to appellant, he clearly heard their conversation: "Mr. Carter and the defendant were talking about a house, about it being burned down. Mr. Kamal stated he didn't care about anybody being in the house * * *."

{¶ 42} We reviewed the entire record and find a greater amount of credible direct and circumstantial evidence was admitted at trial for the jury to reach its decision of appellant's guilt for three counts of attempted murder. Despite appellant's assertions to the contrary, we do not find the jury clearly lost its way to create such a manifest miscarriage of justice as to require a new trial.

{¶ 43} Appellant's first assignment of error is not well-taken.

## II. Sentencing

{¶ 44} In support of his third assignment of error, appellant argued his convictions are void because he was separately sentenced for a merged offense, and R.C. 2941.25(A) prohibits him from being "convicted" of two or more allied offenses of similar import. Although the trial court properly merged counts 2 and 4, and then followed the prosecution's election to sentence as to count 2, appellant argues his sentence was voided

23.

when the trial court separately ordered him to serve five years of mandatory post-release control for count 4. Appellant argues his sentence was also voided when the trial court separately determined he was convicted of an arson-related offense and notified him of his Ohio arson registry obligations. "It is the Appellant's belief, that at sentencing the conviction for Aggravated Arson is not properly registered as a conviction, and that no penalty can be imposed as a result of the guilty finding thereon, due to the doctrine of merger."

{¶ 45} In response, appellee argued the trial courts sentence was not error. Appellee argued the jury found appellant guilty of all counts. Appellee argued "even if the trial court improperly imposed 5 years mandatory post-release control as to count 4, any such error would be harmless because 5 years of mandatory post-release control was already imposed on defendant for counts 1, 2, and 3 and post-release control terms run concurrently." Appellee conceded the trial court properly merged counts 2 and 4 at sentencing and concluded where appellant "was convicted and sentenced on three counts of attempted murder where the predicate offense was aggravated arson * * * Ohio's arson offender registration scheme applies to defendant."

{¶ 46} We review a contrary-to-law challenge to a trial court's felony sentencing determination for clear and convincing evidence in the record. R.C. 2953.08(G)(2)(b). If we find clear and convincing evidence the record does not support the sentence, we may increase, reduce, modify or vacate the felony sentence. *State v. Carnicom*, 6th Dist. Wood No. WD-15-077, 2016-Ohio-7290, ¶ 10-11. "Clear and convincing evidence is

24.

that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. * * * It does not mean clear and *unequivocal*." (Emphasis sic.) *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

{¶ 47} We review a trial court's R.C. 2941.25 determination de novo. *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 23. With respect to the trial court's merger of the sentences for count 2 and count 4, R.C. 2941.25(A) states, "Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." A "conviction" pursuant to R.C. 2941.25 consists of a guilty verdict and the imposition of a sentence or penalty. *State v. Williams*, 148 Ohio St.3d 403, 2016-Ohio-7658, 71 N.E.3d 234, ¶ 17.

{¶ 48} The trial court's March 27, 2018 journalized sentencing entry complied with the statute when it found count 2 and count 4 were allied offenses of similar import and merged them for sentencing purposes. We do not find any evidence in the record to disturb the trial court's factual determinations for purposes of R.C. 2941.25, nor appellee's election to sentence on count 2. *See id.* at ¶ 17-18.

{¶ 49} We find clear and convincing evidence in the record supporting the sentence imposed by the trial court following the merger of counts 2 and 4: a 10-year prison term for count 2 and not for count 4. The total sentence imposed by the trial court was a 20-year prison term: 10 years each for counts 1, 2, and 3, where count 1 ran

25.

concurrently with counts 2 and 3 and where count 2 would be served consecutively to count 3. Thus, appellant was protected from multiple sentences for both count 2 and count 4 as required by R.C. 2941.25(A). *Williams.* at ¶ 2. The sentencing transcript reflects this outcome:

> Q: Judge, just a request for clarification. It's the State's understanding defendant has ten years as to Count 2, another consecutive ten years as to Count 3 for a total of 20 years, and then running concurrent to those is a ten year sentence on Count 1, so still a 20 year aggregate sentence? Count 4 is merging; is that correct?
>
> Court: Yes. * * * So an aggregate 20.

{¶ 50} "Because R.C. 2941.25(A) protects a defendant only from being punished for allied offenses, the determination of the defendant's guilt for committing allied offenses remains intact, both before and after the merger of allied offenses for sentencing." *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 1, paragraph three of the syllabus. Therefore, the jury's determination of appellant's guilt for the four separate offenses, including count 4, is affirmed. *State v. Creech*, 150 Ohio St.3d 540, 2016-Ohio-8440, 84 N.E.3d 981, ¶ 47; *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 153.

{¶ 51} In addition to the prison terms imposed for the first-degree felonies, the trial court "shall include in the sentence a requirement that the offender be subject to a period of post-release control after the offender's release from imprisonment." R.C.

2929.14(D)(1). The mandatory first-degree felony period of post-release control is five years. R.C. 2967.28(B)(1). The trial court notified appellant at sentencing that he will be subject to 5-year post-release control requirements for each first-degree felony offense, including count 4. To address this assignment of error, we must determine if the trial court's 5-year post-release control requirement for count 4 violated R.C. 2941.25(A). R.C. 2967.28(F)(4)(c) requires each of appellant's periods of post-release control to be served concurrently. A post-release control sanction is remedial in nature and not punitive, R.C. 2967.01(O); *State v. Martello*, 97 Ohio St.3d 398, 2002-Ohio-6661, 780 N.E.2d 250, ¶ 40, and upon appellant's release from prison, he will be subject to the same 5-year post-release control period for counts 1, 2 and 3, R.C. 2967.28(F)(4)(a). Nevertheless, pursuant to R.C. 2967.28(B), the trial court is ordered to file a nunc pro tunc entry correcting the post-release control requirement for count 4.

{¶ 52} The trial court also determined appellant was guilty of an "arson-related offense" as defined in R.C. 2909.13. Once again we must determine if the trial court's notification at sentencing of appellant's arson registration requirement violated R.C. 2941.25(A). We find no violation and no prejudice to appellant. Having previously affirmed appellant's guilt for count 4, an "arson-related offense" includes any violation of R.C. 2909.02. R.C. 2909.13(A)(1). Appellant is, therefore, an "arson offender" because he "has been convicted of or pleaded guilty to" an "arson-related offense." R.C. 2909.13(B)(1). A statute's use of the phrase "convicted of or pleads guilty to," such as in R.C. 2909.13(B)(1), has been interpreted by the Ohio Supreme Court to mean only a

27.

determination of guilt is required. *State ex rel. Watkins v. Fiorenzo*, 71 Ohio St.3d 259, 260, 643 N.E.2d 521 (1994); *see State v. Phillips*, 1st Dist. Hamilton Nos. C-150376, C-150378, 2016-Ohio-4672, ¶ 36.

{¶ 53} As an "arson offender," the trial court was required at the time of sentencing to provide appellant with notice of his arson registration duties pursuant to R.C. 2909.15. R.C. 2909.14. The trial court complied with the notice requirement as shown in the transcript of the sentencing hearing and the trial court's March 27, 2018 journalized sentencing entry. Also, the notice to appellant of his duty to comply with the arson registration statute is remedial in nature and not punitive. *State v. Jones*, 6th Dist. Lucas No. L-16-1014, 2017-Ohio-413, ¶ 26-27.

{¶ 54} Our review of the record finds clear and convincing evidence supporting appellant's felony sentences, and the sentences were not contrary to law.

{¶ 55} Appellant's third assignment of error is not well-taken.

### III. Ineffective Assistance of Counsel

{¶ 56} In support of his fourth assignment of error, appellant argued his trial counsel was ineffective because appellant did not testify to refute Mr. Carter's testimony. Appellant argued, "There are many different subjects discussed on the audio which are unclear. It was necessary for Kamal to testify to explain what words were said and the context of the conversations." Appellant further argued only he could explain why he prepared a deed to transfer the subject property to Victoria Wise and why he did not file it with the Recorder's Office: "Kamal's frame of mind was missing without his

28.

testimony." Appellant further argued "he was the only witness that could refute the testimony of Alvarez * * * [of] the existence of this contract for hire that Alvarez alleged existed between the two while at the jail." Appellant argued that because English is his second language, his testimony at trial "was necessary to show that when he was talking to Carter he may have used terms or words that could have more than one meaning due to some of the issues that he has communicating effectively." Appellant concluded, "While normally failing to call a witness is trial strategy, in this matter Kamal needed to testify as to several very important parts of his defense as delineated herein."

{¶ 57} In response, appellee argued his trial counsel's decision to not call defendant as a witness was not ineffective assistance of counsel because the decision inherently weighed the need for the defendant's testimony with the risk of subjecting the defendant to cross-examination. Appellee argued appellant failed to show prejudice as a result of his trial counsel's decision. "Even if the defendant had testified to refute the evidence presented by the State, the jury was able to listen to the recorded conversations with [Mr. Carter] and to the evidence presented, and choose to find the evidence presented by the prosecution credible and convincing."

{¶ 58} An ineffective assistance of counsel claim must overcome the strong presumption that a properly licensed Ohio lawyer is competent. *State v. Roberson*, 6th Dist. Lucas No. L-16-1131, 2017-Ohio-4339, ¶ 95. The record does not show appellant questioned the licensure of his trial counsel, so his competence was presumed.

29.

**{¶ 59}** To overcome this presumption of competence, appellant had the burden to show both: (1) deficient performance by his trial counsel below an objective standard of reasonable representation, and (2) a reasonable probability of prejudice that but for his trial counsel's errors, he would not have been convicted of three counts of attempted murder and one count of aggravated arson. *Id.* "Debatable trial tactics generally do not constitute a deprivation of effective counsel." *State v. Phillips*, 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995).

**{¶ 60}** Appellant's ineffective assistance of counsel claim is based on the fact he did not testify in his own defense at trial. However, only appellant could waive his fundamental and personal right to testify at trial, even if his attorney advised him not to testify. *State v. Turner*, 6th Dist. Wood No. WD-11-025, 2012-Ohio-3863, ¶ 45, citing *State v. Bey*, 85 Ohio St.3d 487, 499, 709 N.E.2d 484 (1999). Appellant's attorney was bound by the requirements of the Ohio Rules of Professional Conduct in effectuating appellant's legal representation. *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 86. "In a criminal case, the lawyer shall abide by the client's decision as to * * * whether the client will testify." Prof.Cond. R. 1.2(a). Appellant does not argue, nor does the record show, appellant's waiver of his right to testify was the result of coercion. *State v. Strong*, 6th Dist. Huron No. H-16-001, 2017-Ohio-859, ¶ 26. The trial court also had no obligation to inquire why he waived this right. *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 257.

{¶ 61} Despite appellant arguing the necessity of his direct testimony, the jury heard evidence, particularly during witness cross-examinations, of his defense arguments. For example, during the cross examinations of Ms. Cooper and Mrs. Lardner, the reason offered for appellant's transfer of title to 5138 Golden Road to Victoria Wise was "because of the water." At the sentencing hearing, appellant's explained that he knew "The water has to be in my name [as the property owner]." He has unpaid bills and nuisance notices at the properties he owns for which he blamed his "maintenance guy." To avoid these responsibilities, appellant transferred the property title: "That's why I put it in her name." Regardless of appellant's detailed explanations at sentencing, the jury was separately aware of appellant's arguments through the cross-examination of the witnesses.

{¶ 62} In another example, appellant argued he was the only one who could correctly say what he discussed with Mr. Alvarez. Even if appellant testified at trial he did not know Mr. Alvarez and never hired him to kill Mr. Carter, the jury heard at trial other evidence which appellant does not refute. Detective Noon testified that the threat to Mr. Carter's safety was investigated and resulted in Mr. Carter's relocation to a hotel and in Mr. Alvarez being vetted to become a confidential informant to law enforcement.

{¶ 63} In another example, appellant argued that because he does not communicate effectively in English, only he can explain what he meant when he spoke with Mr. Carter. However, the jury heard testimony from Ms. Cooper, Mrs. Lardner, Mr. Alvarez, Officer Hurst, Officer Haney, and Detective Noon, aside from Mr. Carter. Each

31.

witness testified to having either directly conversed with appellant, or listened to appellant speak. The jury heard testimony that while appellant's accent and rapid pace of talking were sometimes challenging to a listener, each witness understood appellant and what he meant. In particular, law enforcement listening to appellant's conversations with Mr. Carter heard and understood appellant's role in the criminal plan such that they took the actions that led to the prosecution that is the subject of this appeal.

{¶ 64} Finally, we find appellant had ample opportunity to decide to testify at trial. According to the trial transcript, towards the end of trial appellant informed the trial court, outside of the jury's presence, he had not yet decided if he would testify: "Your honor, if there is another witness, it will be the defendant himself and that is still being discussed." At the end of the prosecution's case, also outside of the hearing by the jury, appellant was consulted and decided he would not testify.

Mr. Wingate: If you can, in one minute, I'll know further.

Court: Thanks.

(Pause in the proceedings.)

Court: Go ahead.

Mr. Wingate: I will indicate that we have no evidence and we would rest, and we choose to do –

Court: I'm sorry.

Mr. Wingate: We will not be presenting any evidence and we will rest.

Court: Okay.

Mr. Wingate: And I will put it on the record formally.

{¶ 65} Thereafter, in open court before the jury, appellant formally waived his right to testify.

Court: Ladies and gentlemen, the State has rested. There will be a formal rest then on behalf of the Defense at this time, also?

Mr. Wingate: Yes, that is correct, Your Honor. I will indicate that at this time, the Defense will rest, also.

{¶ 66} We find the record shows there was a specific pause in the trial for appellant and his attorney to confer about presenting a defense case. The record does not indicate any coercion of appellant to not testify. Even without appellant's direct testimony, the record is not devoid of evidence rebutting the prosecution. Nevertheless, appellant failed to meet his burden that his trial counsel's performance was below an objective standard of reasonable representation and his burden of a reasonable probability of prejudice that but for his trial counsel's errors, he would not have been convicted of attempted murder and aggravated arson.

{¶ 67} Appellant's fourth assignment of error is not well-taken.

### IV. Conclusion

{¶ 68} We affirm the trial court's sentencing judgment, but we remand solely for the limited purpose for the trial court to issue a nunc pro tunc order correcting the post-release control requirement for count 4.

33.

**{¶ 69}** On consideration whereof, we find that substantial justice has been done in this matter and the sentencing judgment of the trial court to be lawful. The judgment of the Lucas County Court of Common Pleas is affirmed, but remanded for the limited purpose for a nunc pro tunc order in accordance with this decision. Appellant is ordered to pay costs of this appeal pursuant to App.R. 24.

Judgment affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.                          _____
                                                              JUDGE
Christine E. Mayle, P.J.

Gene A. Zmuda, J.                             _____
CONCUR.                                                   JUDGE

                                                    _____
                                                              JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.